**In re NUCLEAR IMAGING SYSTEMS, INC., Debtor.**

**In re Cardiovascular Concepts, P.C., Debtor.**

**Nos. 00–19698F, 00–19697F.**

United States Bankruptcy Court, E.D. Pennsylvania.

Oct. 18, 2000.

Albert A. Ciardi, Jr., Philadelphia, PA, David Kraut, Blue Bell, PA, for debtors.

David B. Aaronson, Michael A. Bloom, Morton R. Branzburg, Andrew C. Kassner, Drinker Biddle & Reath, Laurie A. Krepto, Pepper Hamilton LLP, Christopher R. Momjian, Office of Attorney General, James E. O'Neill, III, Ina S. Weiner, Ronald S. Gellert, Mavis Smith, Philadelphia, PA, Derek J. Allen, Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P., Greensboro, NC, Jonathan D. Bennett, Cherry Hill, NJ, Graham D. Guthrie, Thomas R. Merry, Purcell & Scott L.P.A., Dublin, OH, Scott K. Intner, Whiteford Taylor & Preston LLP, Baltimore, MD, Scott R. Lipson, Tallman, Hudders & Sorrentino, P.C., Allentown, PA, Maria K. Pum, San Diego, CA, Linda J. Schwimmer, Lawrenceville, NJ, Ernest B. Thompson, Nashville, TN, David A. Vesel, Raleigh, NC, Robert D. Whaley, Whaley Letteer & Mock, PC, Dallas, TX, for creditors.

Kevin P. Callahan, Philadelphia, PA, trustee.

## MEMORANDUM

BRUCE I. FOX, Chief Judge.

The United States has filed a motion to terminate the bankruptcy stay in order to exercise a common law right of setoff.[1] More specifically, the United States seeks relief from the automatic stay in order to setoff the payment to the debtors of certain prepetition receivables due under the Medicare, Champus [2] and Champva [3] programs against the debtor's prepetition federal tax liabilities.[4] This motion is opposed by a creditor, NPF X, Inc., which

---

1. The United States does not rely upon any statutory provision for setoff and thus none will be considered. *See* Movant's Proposed Conclusion of Law # 2; Posthearing memorandum, at 9.

2. Civilian Health and Medical Programs of the Uniformed Services.

3. Civilian Health and Medical Programs of Veterans Affairs.

4. The evidence disclosed that there were no outstanding Champus or Champva receivables owed to these debtors. Thus, only Medicare receivables are at issue.

asserts a security interest in those prepetition receivables. The debtors do not oppose the relief sought by the United States.[5]

The following facts were proven at an evidentiary hearing held on this motion.

## I.

The chapter 11 debtor, Nuclear Imaging Systems, Inc., filed a voluntary petition in bankruptcy on August 4, 2000. This entity provides mobile diagnostic nuclear cardiovascular testing of individuals. The debtor, Cardiovascular Concepts, P.C., also filed for chapter 11 relief on August 4, 2000. This latter entity contracts with managed healthcare providers to have such cardiovascular tests performed, including tests at fixed site locations, and provides some patient review services. Both of these corporate entities are headquartered in the same location and have similar management. As such, their two cases are being jointly administered at the debtors' request.[6]

Both of these debtors operate in Pennsylvania. One or both of these debtors also operate in various other states. As part of their operations, both entities have been recognized by the Department of Health and Human Services ("HHS") as healthcare providers under the federal Medicare program. *See* Ex. I–2.[7]

Under Medicare Part B, the Health Care Financing Administration (referred to at the hearing as "HCFA"), a federal agency which oversees Medicare reimbursement for HHS, will pay at a scheduled rate for outpatient services provided by these debtors. The debtors file their claims for reimbursement with a "carrier" who, acting on behalf of HCFA, will evaluate the claim and determine the propriety of payment. If the claim is allowed, the carrier—in Pennsylvania, it is an entity known as HGS Administrators—will then use funds provided by HCFA and deposited in a special bank account to pay the approved claim.

As of September 15, 2000, the debtors have computed their outstanding prepetition Medicare Part B outstanding receivables. Ex. I–3. Recognizing that claims are allowed on the fee schedule only as a percentage of the amount billed the patient, the debtors believe that they are owed a combined total of $780,429.24 from HCFA for the provision of pre-bankruptcy services.

The Internal Revenue Service has filed proofs of claim in both chapter 11 cases. It asserts that Cardiovascular Concepts owes it $984,000.69 as of its bankruptcy filing and Nuclear Imaging Systems owes it $1,337,845.27, also as of August 4, 2000. Exs. I–4, I–5. These obligations stem from unpaid federal taxes beginning with those due March 31, 1999. Exs. I–4, I–5.

On July 31, 1998, Nuclear Imaging signed a secured promissory note with

**5.** Another creditor, DVI Financial Services, Inc., may also assert a security interest in these receivables. It too offered no opposition to the instant motion to terminate the stay.

**6.** *Joint administration is permitted by Fed. R.Bankr.P. 1015(b)* and is quite different from substantive consolidation. The former is merely an administrative convenience so that a party need not file identical pleadings in two different bankruptcy cases. The latter combines the assets and liabilities of the different bankruptcy cases into one estate. *See generally, e.g., In re Deltacorp, Inc.,* 179 B.R. 773, 777 (Bankr.S.D.N.Y.1995).

**7.** Approved providers are given provider numbers which identify the entity entitled to payment from the Health Care Financing Administration. Ex. I–2 shows two Pennsylvania provider numbers for Cardiovascular Concepts and one for Nuclear Imaging Systems.

NPF X, Inc. which stated that at that time it was obligated to this creditor in the amount of $6,065,035.10. Ex. A. The collateral is identified in the security agreement as "[a]ll accounts receivable now existing and hereafter existing which are created on the records of NIS arising directly or indirectly from the provision of health care services. . . ." Ex. B, at 2 § 4. Cardiovascular also signed a security agreement as "Hypothecator," pledging collateral for this same loan "[a]ll accounts receivables now existing and hereafter existing which are created on the records of Hypothecator arising directly or indirectly from the provision of health care services. . . ." Ex. B–1, at 1, § 1.

In this contested matter, NPF X, Inc. asserts that its security interests in the Medicare receivables of both debtors were duly perfected in August, 1998. *See* Exs. C–1, C–2, C–3, and C–4 (purporting to be copies of duly recorded financing statements). It further asserts that it holds a secured claim in the amount of $5.9 million against both debtors.[8]

After HCFA learned of the debtors' bankruptcy filings, it instructed its Pennsylvania carrier, HGS, to "administratively freeze" all payments to these debtors of Medicare claims arising from the provision of services pre-bankruptcy. *See generally Citizens Bank of Maryland v. Strumpf,* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995). This has resulted in a freeze of $67,101.75 in payments owed to Cardiovascular on prepetition claims. Ex. I–2.

HCFA and the IRS now seek to terminate the bankruptcy stay so that the latter creditor may setoff funds owed to the debtors by the former federal agency. The requested setoff is to be limited, however, solely to *prepetition* Medicare B receivables. (There was no evidence that the debtors are entitled to payment from either the Champus or Champva programs.) No setoff is requested for receivables created by either debtor after August 3, 2000. *See generally Lee v. Schweiker,* 739 F.2d 870, 875 (3d Cir.1984) ("pre-petition claims against the debtor cannot be setoff against post-petition debts to the debtor").

NPF X, Inc. opposes such relief on three general bases. First, it maintains that HCFA (or HHS) and IRS are not the same entities, and the debts owing to and from the debtor are not in the same "capacity", thereby precluding HCFA (or HHS) from setoff in favor of the IRS. In addition, NPF X, Inc. argues that setoff should not be permitted for equitable reasons. Last, it maintains that, as a perfected secured creditor in these receivables, its security interest has priority over any setoff rights held by these governmental entities.

## II.

### A.

■ The United States seeks to terminate the bankruptcy stay pursuant to 11 U.S.C. § 362(d). Subsection 362(d)(1) states that such relief can be granted for "cause" shown, including a lack of adequate protection for a secured creditor. By virtue of section 506(a), a setoff right gives rise to an allowed secured claim. *See, e.g., In re Rehab Project, Inc.,* 238 B.R. 363, 375 (Bankr.N.D.Ohio 1999)

---

8. The parties agreed that, for purposes of determining this motion, I may assume that NPF X, Inc. has a valid, perfected security interest in the debtors' Medicare receivables. *See generally In re East Boston Neighborhood Health Center Corp.,* 242 B.R. 562, 573 (Bankr.D.Mass.1999) (federal Medicare anti-assignment statutes, including 42 U.S.C. § 1395g(c), do not preclude a valid security interest in Medicare receivables); *In re American Care Corp.,* 69 B.R. 66 (Bankr.N.D.Ill. 1986) (same).

("Congress bestowed upon creditors having a valid right of setoff, the status of an allowed secured claim, thus giving that creditor the highest priority under the Bankruptcy Code. § 506(a)"); *Matter of Olson,* 175 B.R. 30, 32 (Bankr.D.Neb.1994); L. King, 4 *Collier on Bankruptcy,* ¶ 506.03[1][b], at 506–16 (15th ed.rev.1999) ("a claim is a secured claim to the extent of any valid right of setoff").[9]

■ As a general principle, whether to modify, condition, or annul the bankruptcy stay under section 362(d)(1) is committed to bankruptcy court discretion, *see Matter of Holtkamp,* 669 F.2d 505 (7th Cir.1982); *In re Shariyf,* 68 B.R. 604 (E.D.Pa.1986), and is to be determined by examining the totality of the circumstances. *Accord Matter of Baptist Medical Center of New York, Inc.,* 52 B.R. 417, 425 (E.D.N.Y. 1985), *aff'd,* 781 F.2d 973 (2nd Cir.1986).

■ While section 362(g) imposes upon the party opposing relief from the stay the burden of proof on all issues other than equity, courts generally have recognized that a party seeking relief from the stay has some initial burden to demonstrate "cause" for relief. *E.g., In re Purnell,* 92 B.R. 625, 631 (Bankr.E.D.Pa.1988):

> Courts in this district have long held that while 11 U.S.C. § 362(g)(2) places the burden of proof upon a debtor, an initial burden of production rests upon a creditor who desires relief from the automatic stay.

*See generally In re Ward,* 837 F.2d 124, 128 (3d Cir.1988).

■ Courts have generally concluded that the existence of mutual obligations subject to set-off constitutes sufficient 'cause' to meet the creditor's initial eviden-

tiary burden in seeking relief from the automatic stay. *Accord In re Orlinski,* 140 B.R. 600, 603 (Bankr.S.D.Ga.1991) ("By establishing its right of setoff, the IRS has made a prima facie showing of 'cause' for relief from stay under § 362(d)(1)"); *In re Coleman,* 52 B.R. 1, 3 (Bankr.S.D.Ohio 1985); *In re Flanagan Bros., Inc.,* 47 B.R. 299, 303 (Bankr.D.N.J. 1985).

■ The burden of persuasion then shifts to the party opposing relief. That burden could be met, *inter alia,* by demonstrating that the moving creditor has no right of setoff. *See In re Freeborn,* 100 B.R. 474, 475 (Bankr.E.D.Mo.1989); *see also In re Parrish,* 75 B.R. 14 (N.D.Tex. 1987) (valid right of setoff constituted "cause" for relief from the stay). The respondent's burden as objector can also be met by demonstrating that the interests of the movant seeking setoff are adequately protected. *See In re Carlyle,* 242 B.R. 881, 895–96 (Bankr.E.D.Va.1999); *Matter of Olson,* 175 B.R. at 33.

In the matter at bench, NPF X, Inc. does not suggest that the interests of the United States are adequately protected within the meaning of 11 U.S.C. § 361. The objector here asserts security interests in the Medicare Part B receivables, which are the subject of this dispute. If the IRS is unable to setoff against these receivables, NPF X, Inc. will almost certainly demand that the proceeds be paid to it upon receipt by these debtors.

Thus, the opposition to the instant motion focuses upon the propriety of the right to setoff rather than upon adequate protection. *Cf. Omega Environmental Inc. v. Valley Bank NA,* 219 F.3d 984, 986 n. 1

---

9. Although a creditor with a right of setoff may be considered as holding a "secured claim" for bankruptcy purposes, the Third Circuit Court of Appeals has instructed that "the term 'setoff' does not refer to the same type of interest as a 'lien.'" *Folger Adam Security, Inc. v. DeMatteis/MacGregor JV,* 209 F.3d 252, 260 (3d Cir.2000).

(9th Cir.2000) ("A creditor holding an unperfected security interest is not entitled to relief from [the] automatic stay").

### B.

■ Before addressing the various issues posed by these parties, I recognize that, in general, a contested matter under section 362(d)(1) is not the proper procedural vehicle for adjudicating the extent and validity of claims. Section 362(e) requires that lift stay motions be heard expeditiously; further, Fed.R.Bankr.P. 7001(2) provides that an adversary proceeding—*i.e.*, a complaint—is generally required to determine the validity or priority of a "lien or other interest in property. . . ."

The statutory requirement of a prompt adjudication of all lift stay motions is premised upon the congressional understanding that the rights of creditors may be materially diminished if the automatic stay remains in place for any extended period of time. As Congress explained:

> the bill [including the provisions of § 362(e)] enunciates the standards for relief, and further provides that unless the court acts quickly, the relief is automatic on request of a creditor. Too often today, court delay in handling requests amounts to complete denial of relief.

H.Rep. No. 595, 95th Cong.2d Sess. 175, *reprinted in* 1978 U.S.Code Cong. & Admin.News at 6136. *See In re Wedgewood Realty Group, Ltd.*, 878 F.2d 693, 700 (3d Cir.1989); *see also, e.g., In re Wood*, 33 B.R. 320, 321 (Bankr.D.Idaho 1983) ("Section 362(e) is a specific provision enacted by Congress for the purpose of providing a special protection and a speedy remedy to secured creditors"); *Matter of Georgia Steel, Inc.*, 19 B.R. 523, 524 (Bankr. M.D.Ga.1982).

■ Given the need for summary treatment of lift stay motions, when a party opposes a motion of a creditor to terminate the stay and raises affirmative defenses to the validity of the claim itself, it may often be proper to require that the objector come forward during the lift stay hearing simply with sufficient evidence to demonstrate that there is a reasonable probability that the objector would prevail in later litigation which can completely determine those challenges to the claim. *See, e.g., In re Fitzgerald*, 237 B.R. 252, 259–60 (Bankr. D.Conn.1999); *In re Moore & White Co., Inc.*, 83 B.R. 277, 283–84 (Bankr.E.D.Pa. 1988); *In re Gellert*, 55 B.R. 970, 976 (Bankr.D.N.H.1985); *cf. In re Orion Pictures Corp.*, 4 F.3d 1095, 1098–99 (2nd Cir.1993) ("At heart, a motion to assume should be considered a summary proceeding, intended to efficiently review the trustee's or debtor's decision to adhere to or reject a particular contract in the course of the swift administration of the bankruptcy estate. It is not the time or place for prolonged discovery or a lengthy trial with disputed issues"), *cert. dismissed sub nom. Orion Pictures Corp. v. Showtime Networks, Inc.*, 511 U.S. 1026, 114 S.Ct. 1418, 128 L.Ed.2d 88 (1994).

■ Here, NPF X, Inc. raises a number of issues with respect to the validity of the setoff rights of the United States in the debtors' Medicare receivables. The United States (as orally stated in open court) is not requesting that this court grant it any relief other than to terminate the stay. Nonetheless, I consider it appropriate to determine the government's right to setoff in this dispute, rather than defer that question to future litigation.

First, both parties have fully argued their legal positions concerning setoff, thus evidencing an expectation that a determination on that issue will now be made. Second, the evidentiary record here is small and largely uncontested. No party

has suggested the issue of setoff needs to be deferred until extensive discovery and trial preparation has occurred. Thus, numerous courts have decided setoff rights in the context of a motion to lift stay. *See, e.g., In re Medina*, 205 B.R. 216 (9th Cir. BAP 1996); *In re Alliance Health of Fort Worth, Inc.*, 240 B.R. 699 (N.D.Tex.), *aff'd without op.*, 200 F.3d 816 (5th Cir.1999); *In re Whimsy, Inc.*, 221 B.R. 69 (S.D.N.Y. 1998); *In re Metropolitan Hosp.*, 131 B.R. 283 (E.D.Pa.1991).

Third, and most important, were I to grant the government's motion to terminate the automatic stay, NPF X, Inc. may not have any other opportunity to challenge the subsequent setoff of these receivables.

As will be mentioned below (and not contested by NPF X, Inc.), there are anti-assignment provisions in the Medicare statute which prevent "factoring," or the sale of the receivables to a third party. HCFA is obligated to pay claims only to the Medicare service providers, not to their creditors. To successfully collateralize these receivables in face of such legislation, creditors devise mechanisms (as NPF X, Inc. apparently did here) to insure their access to proceeds as soon as payment is made to a provider (*e.g.*, a "lock box account"). *See generally* Harrell and Folk, "Financing American Health Security: The Securitization of Healthcare Receivables," 50 *Bus.Law* 47 (1994).

If the bankruptcy stay is terminated so that the United States may setoff the receivables due from the debtors, then it seems to me unlikely that NPF X, Inc. could bring litigation against the government to recover the proceeds of those receivables without the cooperation of the debtors. The creditor may have no legal right on its own to demand payment from the government. As the debtors here do not oppose setoff, they are not likely to join NPF X, Inc. at some later time and challenge the setoff.

Thus, for these reasons, I will determine the government's right of setoff.

### III.

Recently, the Supreme Court explained the applicability of setoff in bankruptcy cases:

> The right of setoff (also called "offset") allows entities that owe each other money to apply their mutual debts against each other, thereby avoiding "the absurdity of making A pay B when B owes A." *Studley v. Boylston Nat. Bank*, 229 U.S. 523, 528, 33 S.Ct. 806, 57 L.Ed. 1313 (1913). Although no federal right of setoff is created by the Bankruptcy Code, 11 U.S.C. § 553(a) provides that, with certain exceptions, whatever right of setoff otherwise exists is preserved in bankruptcy.

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. at 18, 116 S.Ct. 286.

To the extent that a creditor has a prepetition right of setoff which is preserved by section 553(a) of the Code, that right is initially enjoined by the bankruptcy stay. 11 U.S.C. § 362(a)(7); *accord Citizens Bank of Maryland v. Strumpf*, 516 U.S. at 19, 116 S.Ct. 286 ("It is also undisputed that under § 362(a)[7] respondent's bankruptcy filing stayed any exercise of that right [of setoff] by petitioner").

Here, the United States requests that the automatic stay be terminated pursuant to 11 U.S.C. § 362(d) so that it may exercise its non-bankruptcy, common law right of setoff. *See generally U.S. on Behalf of I.R.S. v. Norton*, 717 F.2d 767, 771 (3d Cir.1983) ("Thus, before a setoff can be made against the debts owed by a petitioner in bankruptcy, a creditor must seek relief from the automatic stay"). NPF X, Inc. argues that no such right exists and

so relief from the bankruptcy stay should not be granted.

■ In order to possess a right of setoff, there must be a mutuality of obligations between the debtor and the creditor asserting a right to setoff. As stated by the Third Circuit Court of Appeals, "[t]To be mutual, the debts must be in the same right and between the same parties, standing in the same capacity." *In re Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d 54, 59 (3d Cir. 1990) (*quoting* L. King, 4 *Collier on Bankruptcy*, ¶ 553.04[3], at 553–22 (15th ed.1979)); *accord, e.g., In re Davidovich*, 901 F.2d 1533, 1537 (10th Cir.1990).

In opposing the instant motion, NPF X, Inc. contends that there is no right of setoff because there is an absence of "mutuality." It maintains that a debt owed to the IRS is not mutual with an obligation owed to the debtor by HCFA or HHS. *See generally Gray v. Rollo*, 85 U.S. [18 Wall.] 629, 21 L.Ed. 927 (1873) (mutuality for purposes of setoff is absent when a partnership has a claim against an individual but the individual has a claim against a partner of the partnership). The movant counters that the debts owing to and from these debtors are indeed mutual because the various agencies of the United States represent a "unitary creditor."

### A.

■ In general, the United States has the same common law right to setoff as any other creditor. *See, e.g., United States v. Munsey Trust Co. of Washington, D.C.*, 332 U.S. 234, 239, 108 Ct.Cl. 765,

67 S.Ct. 1599, 91 L.Ed. 2022 (1947) ("The government has the same right 'which belongs to every creditor, to apply the unappropriated moneys of his debtor, in his hands, in extinguishment of the debts due to him'") (*quoting Gratiot v. United States*, 40 U.S. 336, 370, 15 Pet. 336, 10 L.Ed. 759 (1841)); *Amoco Production Co. v. Fry*, 118 F.3d 812, 817 (D.C.Cir.1997) ("Like private creditors, the federal government has long possessed the rights of offset at common law").[10] Moreover, "[o]utside of bankruptcy, the federal government is considered a single-entity that is entitled to set off one agency's debt to a party against that party's debt to another agency." *United States v. Maxwell*, 157 F.3d 1099, 1102 (7th Cir.1998).

■ The decision most often cited in support of the "unitary creditor" principle is *Cherry Cotton Mills v. United States*, 327 U.S. 536, 105 Ct.Cl. 824, 66 S.Ct. 729, 90 L.Ed. 835 (1946). The Court therein held, in a non-bankruptcy context, that money owed to a debtor by the Department of the Treasury as a tax refund under the Agricultural Adjustment Act could be used to offset a defaulted loan owed by the debtor to the Reconstruction Finance Corporation. *Id.*, at 538, 66 S.Ct. 729.

Based upon the holding in *Cherry Cotton Mills*, and recognizing that section 553(a) of the Bankruptcy Code preserves setoff rights of a creditor that exist outside of bankruptcy, the vast majority of courts have concluded, within the confines of a bankruptcy case, that all agencies of the United States constitute a single "unitary

---

**10.** Section 6323 of Title 26 addresses the situation where liens held by the IRS are primed by third party liens. "[T]his common law right [of setoff] exists independent of and is unaffected by the provisions of 26 U.S.C. § 6323, which statute establishes the validity and priority of tax liens on property as against others with interests in the property." *In re Medina*, 177 B.R. 335, 347 (Bankr.D.Or. 1994), *rev'd in part on other gnds*, 205 B.R. 216 (9th Cir. BAP 1996); *accord Aetna Ins. Company v. United States*, 197 Ct.Cl. 713, 456 F.2d 773, 775–76 (1972).

creditor" for purposes of setoff under section 553. *See, e.g., United States v. Maxwell,* 157 F.3d at 1102; *In re Hal, Inc.,* 122 F.3d 851, 852–53 (9th Cir.1997); *In re Chateaugay Corp.,* 94 F.3d 772, 779 (2nd Cir.1996) (holding that there is a common law right to offset tax refunds against claims of other federal agencies); *In re Turner,* 84 F.3d 1294, 1296 (10th Cir.1996) (*en banc*) ("We now hold that the United States is a unitary creditor for purposes of bankruptcy. Therefore, the debts owed from the Turners to the SBA and from the ASCS to the Turners are 'mutual debts' and may be set off subject to any applicable exceptions in § 553") (footnote omitted); *Doe v. United States,* 58 F.3d 494, 498 (9th Cir.1995).

Although, as cited by NPF X, Inc., there are a few decisions holding to the contrary, *see, e.g., In re Ionosphere Clubs, Inc.,* 164 B.R. 839, 843 (Bankr.S.D.N.Y.1994); *In re Hancock,* 137 B.R. 835, 846 (Bankr. N.D.Okla.1992), the minority viewpoint is not persuasive in light of the decision reached in *Cherry Cotton Mills* and the accepted construction of section 553. (Indeed, no circuit court has accepted this minority position.) *Accord* L. King, 5 *Collier on Bankruptcy,* ¶ 553.03[3][b][iii] (15th ed.rev.1999):

> A majority of courts apply the unitary creditor theory, reasoning in part that there is only one United States and that all of its agencies act on its behalf as part of a unified government. However, a minority of courts have taken a more restrictive view. *The better view is the majority approach, which is consistent with the Supreme Court's analysis in Cherry Cotton Mills.*

*Id.,* at 553–31 to 32 (emphasis added) (footnotes omitted); *see also In re Lopes,* 211 B.R. 443 (D.R.I.1997) (IRS and HUD are a unitary creditor for setoff purposes), *reversing In re Lopes,* 197 B.R. 15 (Bankr. D.R.I.1996).

Consistent with this approach, the IRS has been permitted to setoff funds due to debtors from the Department of Agriculture against federal tax obligations. *In re Medina.* The IRS was also permitted to setoff Customs Service refunds due to the debtor against tax liabilities owed. *In re Whimsy, Inc.,* 221 B.R. 69 (1998)

I see no basis to conclude in this contested matter that the IRS has no common law right to setoff a tax obligation owed by these debtors against Medicare receivables owed to the debtors from HCFA. *See In re Alliance Health of Fort Worth, Inc.* Had these debtors not filed for bankruptcy, such a setoff would have been permitted under federal law. Accordingly, to the extent that NPF X, Inc. opposes the instant motion on the basis of a lack of mutuality, its opposition is unpersuasive.[11]

## B.

NPF X, Inc. raises two other issues related to the government's right of setoff.

■ First, in order to possess a common law right of setoff, the mutual debts must be owed in the same "capacity." L. King, 5 *Collier on Bankruptcy,* ¶ 553.03[3][c] (15th ed.rev.1999). As explained by this bankruptcy commentator:

> The distinction between the concept of "capacity" and the requirement that the obligations be owed between the "same parties" is that the latter refers to the identity of the parties whereas the for-

---

11. NPF X, Inc. suggests that the "unitary creditor" approach may have consequences for the United States in bankruptcy cases outside of the setoff context. Whether or not this suggestion is accurate, it would not serve to defeat the government's lift stay motion to assert its setoff right.

mer refers to their relationship to each other....

As a general rule, the concept of capacity requires that the parties must each owe the other something in his or her own name, and not as a fiduciary.... [I]f A in his individual capacity owes $100 to B, but B owes $50 to A in A's capacity as a trustee of a trust, or as a fiduciary or agent for some other party, the obligations are not mutual because they are not owed between the parties acting in the same "capacity."

*Id.*, at 553–32; *see In re Bevill, Bresler & Schulman Asset Management Corp.*, 896 F.2d at 57–58; *In re Carlyle*, 242 B.R. 881, 888 n. 4 (Bankr.E.D.Va.1999) ("A trustee cannot set off against the trust fund held by him his individual demand against the creator of the trust. 'In this connection, equity treats the fiduciary as holding the res in a separate capacity'") (*quoting First Nat. Bank of Waynesboro v. Johnson*, 183 Va. 227, 31 S.E.2d 581, 585 (1944)); *In re Medina*, 177 B.R. at 349 ("an ordinary debt may not be set off against funds held in trust for the other"), *rev'd in part on other gnds, In re Medina*, 205 B.R. 216 (9th Cir. BAP 1996).

Here, NPF X, Inc. argues that the debtors are "fiduciary or collection agent[s] for the benefit of NPF in relation to the monies payable by HHS" [*i.e.*, their Medicare receivables]. NPF X, Inc. Memorandum "Contra to Motion", at 11. Based upon that asserted relationship, this creditor argues that the United States and the debtors do not hold mutual debts in the same capacity.

■ Whether the debtors are indeed fiduciaries of NPF X, Inc., based upon their security agreements, I need not now determine. The present facts do not represent an attempt by a fiduciary—*viz.*, the United States or one of its agencies—to setoff an individual claim against funds held by it in trust for another. NPF X, Inc. does not argue, nor can it, that HHS or HCF A hold any funds in trust for it or in trust for the debtors. These government agencies do not stand in any fiduciary capacity to NPF X, Inc. or to these debtors. Therefore, the mutual obligations of the claims owing to and from these debtors are considered debts held in the same "capacity." *See generally In re Metropolitan Hosp.* (setoff of Medicare receivables was permitted under section 553(a) despite existence of security interest in those receivables).

C.

■ Finally, NPF X, Inc. argues that the unitary creditor approach only applies when the agencies involved are functioning for a purely governmental purpose. *Accord, e.g., Doe v. United States*, 58 F.3d at 498 ("all agencies of the United States, except those acting in some distinctive private capacity, are a single governmental unit"); *see Cherry Cotton Mills Inc. v. United States*, 327 U.S. at 539, 66 S.Ct. 729. When an entity acts in a purely private capacity, it is not unified with federal governmental agencies and no mutuality of obligations arises.

In deciding whether the Reconstruction Finance Corporation was a federal agency for setoff purposes, or merely acting as private entity, the Supreme Court stated:

We have no doubt but that the set-off and counterclaim jurisdiction of the Court of Claims was intended to permit the Government to have adjudicated in one suit all controversies between it and those granted permission to sue it, whether the Government's interest had been entrusted to its agencies of one kind or another. Every reason that could have prompted Congress to authorize the Government to plead counterclaims for debts owed to any of its other

agencies applies with equal force to debts owed to the R.F.C. Its Directors are appointed by the President and affirmed by the Senate; its activities are all aimed at accomplishing a public purpose; all of its money comes from the Government; its profits if any go to the Government; its losses the Government must bear. That the Congress chose to call it a corporation does not alter its characteristics so as to make it something other than what it actually is, an agency selected by Government to accomplish purely Governmental purposes.

*Cherry Cotton Mills Inc. v. United States,* 327 U.S. at 539, 66 S.Ct. 729.

Thus, in determining that the RFC was acting as a governmental entity, the Court emphasized the following facts:

(1) Its Directors are appointed by the President of the United States;

(2) Its Directors are confirmed by the Senate;

(3) Its activities are all aimed at accomplishing a public purpose;

(4) All of its money comes from the Government;

(5) Its profits, if any, go to the Government; and

(6) Its losses the Government must bear.

*In re Art Metal U.S.A., Inc.,* 109 B.R. 74, 79 (Bankr.D.N.J.1989).

NPF X, Inc. argues that HHS is acting is a "distinctive private capacity in administering the Medicare program." Memorandum "Contra ... to Motion," at 9. It so contends because the Supreme Court has described the Medicare Part B program as one that "resembles a private medical insurance program that is subsidized in major part by the Federal Government." *Schweiker v. McClure,* 456 U.S. 188, 190, 102 S.Ct. 1665, 72 L.Ed.2d 1 (1982).

Simply because a governmental agency acts in a manner similar to a private entity does not mean that the agency is acting for a private purpose. For example, private lenders make student loans. Nonetheless, the Department of Education—which guaranteed a student loan made by a local bank—was found to be a unified creditor with the IRS for setoff purposes. *In re Stall,* 125 B.R. 754 (Bankr.S.D.Ohio 1991).

In *McClure,* the Supreme Court provided this detailed explanation of the Medicare Part B program administered by the Department of Health and Human Services:

Title XVIII of the Social Security Act, 79 Stat. 291, as amended, 42 U.S.C. § 1395 *et seq.* (1976 ed. and Supp.IV), commonly known as the Medicare program, is administered by the Secretary of Health and Human Services. It consists of two parts. Part A, which is not at issue in this case, provides insurance against the cost of institutional health services, such as hospital and nursing home fees. §§ 1395c–1395i–2 (1976 ed. and Supp.IV). Part B is entitled "Supplementary Medical Insurance Benefits for the Aged and Disabled." It covers a portion (typically 80%) of the cost of certain physician services, outpatient physical therapy, X-rays, laboratory tests, and other medical and health care. *See* §§ 1395k, 13951, and 1395x(s) (1976 ed. and Supp.IV). Only persons 65 or older or disabled may enroll, and eligibility does not depend on financial need. Part B is financed by the Federal Supplementary Medical Insurance Trust Fund. See § 1395t (1976 ed. and Supp. IV). This Trust Fund in turn is funded by appropriations from the Treasury, together with monthly premiums paid by the individuals who choose voluntarily to enroll in the Part B program. See §§ 1395j, 1395r, and 1395w (1976 ed. and Supp.IV). Part B consequently resem-

bles a private medical insurance program that is subsidized in major part by the Federal Government.

Part B is a social program of substantial dimensions. More than 27 million individuals presently participate, and the Secretary pays out more than $10 billion in benefits annually.... In 1980, 158 million Part B claims were processed.... In order to make the administration of this sweeping program more efficient, Congress authorized the Secretary to contract with private insurance carriers to administer on his behalf the payment of qualifying Part B claims. *See* 42 U.S.C. § 1395u (1976 ed. and Supp.IV). (In this case, for instance, the private carriers that performed these tasks in California for the Secretary were Blue Shield of California and the Occidental Insurance Co.) The congressional design was to take advantage of such insurance carriers' "great experience in reimbursing physicians." H.R.Rep. No. 213, 89th Cong., 1st Sess., 46 (1965), U.S.Code Cong. & Admin.News 1965, pp. 1943, 1993. See also 42 U.S.C. § 1395u(a); S.Rep. No. 404, 89th Cong., 1st Sess., 53 (1965), U.S.Code Cong. & Admin.News 1965, pp. 1943, 1993.

The Secretary pays the participating carriers' costs of claims administration. *See* 42 U.S.C. § 1395u(c). In return, the carriers act as the Secretary's agents. *See* 42 CFR § 421.5(b) (1980). They review and pay Part B claims for the Secretary according to a precisely specified process. *See* 42 CFR part 405, subpart H (1980). Once the carrier has been billed for a particular service, it decides initially whether the services were medically necessary, whether the charges are reasonable, and whether the claim is otherwise covered by Part B. *See* 42 U.S.C. § 1395y(a) (1976 ed. and Supp.IV); 42 CFR § 405.803(b) (1980).

If it determines that the claim meets all these criteria, the carrier pays the claim out of the Government's Trust Fund—not out of its own pocket. *See* 42 U.S.C. §§ 1395u(a)(1), 1395u(b)(3), and 1395u(c) (1976 ed. and Supp.IV).

Should the carrier refuse on behalf of the Secretary to pay a portion of the claim, the claimant has one or more opportunities to appeal. First, all claimants are entitled to a "review determination," in which they may submit written evidence and arguments of fact and law. A carrier employee, other than the initial decisionmaker, will review the written record de novo and affirm or adjust the original determination. 42 CFR §§ 405.807–405.812 (1980); *McClure v. Harris,* 503 F.Supp. 409, 411 (N.D.Cal. 1980). If the amount in dispute is $100 or more, a still-dissatisfied claimant then has a right to an oral hearing. *See* 42 U.S.C. § 1395u(b)(3)(C); 42 CFR §§ 405.820–405.860 (1980). An officer chosen by the carrier presides over this hearing. § 405.823. The hearing officers "do not participate personally, prior to the hearing [stage], in any case [that] they adjudicate." 503 F.Supp., at 414. *See* 42 CFR § 405.824 (1980).

Hearing officers receive evidence and hear arguments pertinent to the matters at issue. § 405.830. As soon as practicable thereafter, they must render written decisions based on the record. § 405.834. Neither the statute nor the regulations make provision for further review of the hearing officer's decision. *See United States v. Erika, Inc.,* 456 U.S. 201, 102 S.Ct. 1650, 72 L.Ed.2d 12.

*Schweiker v. McClure,* 456 U.S. at 190–91, 102 S.Ct. 1665 (footnote omitted).

Based upon this description of Medicare Part B, it is evident that HHS administers an important "social program," with eligi-

738

bility for its coverage not dependent upon pre-existing medical conditions, involving substantial expenditures of government funds held in "trust" (for the taxpayer beneficiaries), overseen by a Secretary of HHS confirmed by Congress, involving elaborate administrative procedures to resolve claim disputes, and for which the government bears all losses. Given the factors noted in *Cherry Cotton Mills*, mentioned above, I easily conclude that HHS is acting as a governmental entity in its operation of the Medicare Part B program, assisted by HCFA. Therefore, this federal agency is a unified creditor with the IRS. *See In re Alliance Health of Fort Worth, Inc.*

## IV.

While I have concluded that the United States has a non-bankruptcy law right of setoff against these debtors, which the Bankruptcy Code does not extinguish, NPF X, Inc. raises two additional arguments against setoff which are somewhat related. First, this creditor argues that its security interest primes any setoff rights which the United States may have. Second, it argues that permitting setoff of secured Medicare receivables will cause inequities and make lending more difficult in the "troubled healthcare industry." Memorandum "Contra ... Motion," at 18.

NPF X, Inc. continues in this vein: If agencies of the United States "are deemed to be a unitary creditor and thus permitted to setoff, advice to lenders secured in Medicare ... receivables will be to stop funding borrowers at the first sign of trouble. What financier in its right mind would advance funds if the lien that it thinks it is getting is trumped by some unknown agency of the Federal Government?" *Id.*, at 20. That is, in order to prevent Medicare providers from being denied full access to credit markets, NPF X, Inc. maintains that it is essential that

bankruptcy courts not allow the setoff of collateralized Medicare receivables.

## A.

It has been acknowledged in a non-bankruptcy context that "setoff will not be permitted when it would be inequitable or contrary to public policy to do so." *Federal Deposit Ins. Corp. v. Bank of America Nat. Trust and Sav. Ass'n,* 701 F.2d 831, 836 (9th Cir.), *cert. denied,* 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983). This concept has been incorporated implicitly into the setoff provisions of section 553, "whose language is permissive, not mandatory." *U.S. on Behalf of I.R.S. v. Norton,* 717 F.2d 767, 773 (3d Cir.1983); *see, e.g., In re Hal, Inc.,* 122 F.3d at 854.

Nonetheless, setoffs under section 553 "are generally favored, [although] not automatically permitted." *Melamed v. Lake County Nat. Bank,* 727 F.2d 1399, 1404 (6th Cir.1984). As explained by one appellate court in the context of a receivership proceeding:

The right to setoff exists where there are mutual debts between parties ... The district court has discretion whether to allow a setoff against a receiver, and this decision will be overturned for an abuse of discretion.... This discretion has, of course, limits and is governed by equity jurisprudence.... The district court must weigh the equities to determine whether to allow setoff....

Recognizing a strong federal policy towards allowing setoff, the Second Circuit is reluctant to disturb this policy unless compelling circumstances require it. A decision disallowing a setoff must not be made cavalierly....

Likewise, other courts have recognized that there is practically a presumption in favor of allowing setoff....

The burden is on the party moving to deny setoff to prove that setoff should be denied.

*S.E.C. v. Elliott*, 953 F.2d 1560, 1572 (11th Cir.1992) (citations omitted), *rev'd in part on other gnds*, 998 F.2d 922 (11th Cir. 1993).

■ Generally, courts have disallowed an otherwise valid common law right to setoff in "compelling circumstances," *In re Whimsy, Inc.*, 221 B.R. at 74, where the creditor has committed inequitable, illegal or fraudulent acts, or the application of setoff would violate public policy. *See, e.g., In re Cascade Roads, Inc.*, 34 F.3d 756, 766 (9th Cir.1994) (United States acted inequitably); *In re Calore Exp. Co., Inc.*, 199 B.R. 424, 432 (Bankr.D.Mass. 1996) (United States conduct amounted to a "waiver" of any right to setoff).[12]

For example, the District Court in *In re Whimsy, Inc.*, found no inequitable conduct on the part of the United States when the IRS negotiated a settlement of its claim in a bankruptcy case which did not refer to any setoff of the debtor's claim against the Customs Service. The United States was later permitted to setoff those two claims. 221 B.R. at 75–76.

■ Similarly, the application by the United States of the "unitary creditor" theory of setoff for its various federal agencies does not, by itself, represent any inequitable conduct on the part of this creditor. In this contested matter, NPF X, Inc. is really complaining about the unfairness of this doctrine, an issue of policy which I cannot address and which

would not justify denial of setoff rights. *Accord In re Hal, Inc.*, 122 F.3d at 854; *see United States v. Maxwell*, 157 F.3d at 1102–03:

> There may be grounds on which the federal government could be denied its right to setoff in a particular case ..., but there is nothing in the record here to support such a judgment. The only possible wrongdoing by the government involved the Navy's allegedly sloppy supervision of Pyramid's selection of sureties. This issue was not raised below in the appellees' arguments against setoff, and is of no consequence regardless, since even if the United States were negligent, it owed no duty to All American and Gerson....
>
> The government of the United States suffers no special handicap under § 553 of the Bankruptcy Code. Indeed, it seems to us that such a rule would be inconsistent with the overall tenor of the Supreme Court's decision in *United States v. Reorganized CF & I Fabricators of Utah, Inc.*, 518 U.S. 213, 229, 116 S.Ct. 2106, 135 L.Ed.2d 506 (1996), which held that bankruptcy courts could not, in the name of equitable subordination, categorically subordinate certain claims, because such an act would intrude on the legislative function. Therefore, the SBA was entitled set off the Navy's debt to Pyramid's estate against the estate's debt to the SBA....

(citations omitted).

There has been no demonstration of inequitable conduct or compelling circum-

---

12. A few decisions suggest that setoff may be denied when it would significantly affect a debtor's ability to reorganize. *See, e.g., In re Utica Floor Maintenance, Inc.*, 41 B.R. 941 (N.D.N.Y.1984). If I assume *arguendo* that this factor may justify denial of setoff rights, I note in this instance that the debtors have no objection to the IRS's assertion of setoff rights and do not intend to use the proceeds of these receivables as part of their reorganization.

(At this point, it would appear that the debtors' reorganization strategy is premised upon the sale of various assets.) Only a purported secured creditor opposes the relief sought and that creditor seeks to obtain the proceeds of the receivables for itself. Therefore, one cannot conclude that the setoff of these receivables would hamper these debtors' capacity to reorganize.

stances in these two jointly administered bankruptcy cases which would justify the denial of the government's common law setoff rights. I leave to Congress and to the marketplace consideration of the issue whether allowing the United States to setoff its claim against secured Medicare (or other healthcare) receivables will adversely affect the financial health of providers and the overall provision of medical care in this country. *See generally* Harrell and Folk, "Financing American Health Security: The Securitization of Healthcare Receivables," 50 *Bus.Law* 47 (1994).[13]

## B.

■ Finally, NPF X, Inc. contends that its security interest in the debtors' Medicare Part B receivables trumps any setoff rights the United States may have and thus deprives the government of the right to setoff, relying upon *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d 615, 619 (2nd Cir.1989) (construing New York State's enactment of the Uniform Commercial Code to hold on the facts before it that a security interest has priority over a later arising setoff right). *See also In re Calore Express Co., Inc.*, 199 B.R. 424, 433 (Bankr.D.Mass.1996) ("A

creditor's right of setoff is subordinate to the claim of a creditor with a security interest in accounts receivable that was perfected before the right of setoff arose").

This contention is based upon the general notion that the priority of competing interests is determined by the principle: "first in time, first in right." *MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d at 620. In NPF X, Inc.'s view, one should apply U.C.C. § 9–312(e)(1), 13 Pa.C.S.A. § 9312(e)(1),[14] and simply compare the date when the security interest was perfected with the date the right of setoff accrued; whichever occurs first would prevail. Respondent's Memorandum "Contra ... Motion," at 14–15; Posthearing Memorandum, at 2–3. *See In re Gibson Group*, 126 B.R. 759, 762 (Bankr.S.D.Ohio 1991).

Since section 362(d) does not limit relief from the automatic stay to secured creditors holding only a priority interest in collateral, the contention of NPF X, Inc., even if legally correct, would not generally defeat the instant motion. No party requests in this contested matter that NPF X, Inc.'s security interest be eliminated; thus, were the bankruptcy stay lifted, the

---

**13.** In one of its memoranda, NPF X, Inc. briefly suggests that setoff by the government should be denied because the IRS may be a lien creditor and could look to secured assets for payment. Creditor's Memorandum "Contra to ... Motion ..." at 6. Not only does the evidentiary record fail to disclose the existence or extent of any purported lien, but NPF X, Inc. asserts a lien on all of the debtors' assets. Not only is marshaling inapplicable on this evidentiary record, NPF X, Inc. cites no decision holding that setoff should be denied to a creditor on the basis of "marshaling." *See In re Wefelmeyer Construction Co.*, 1997 WL 37574, *7 (Bankr.E.D.Mo.1997) (equitable subrogation would not justify denying a right of setoff); *In re Lawson*, 187 B.R. 6, 8 (Bankr.D.Idaho 1995) (IRS cannot be compelled to apply setoff to priority as opposed to general unsecured claims).

**14.** This provision states:

e) Rules of priority in absence of other rules.—In all cases not governed by other rules stated in this section (including cases of purchase money security interests which do not qualify for the special priorities set forth in subsections (c) and (d)), priority between conflicting security interests in the same collateral shall be determined according to the following rules:

(1) Conflicting security interests rank according to priority in time of filing or perfection. Priority dates from the time a filing is first made covering the collateral or the time the security interest is first perfected, whichever is earlier, provided that there is no period thereafter when there is neither filing nor perfection.

exercise of setoff may occur and yet be subject—theoretically—to any valid security interests which prime that right. *See MNC Commercial Corp. v. Joseph T. Ryerson & Son, Inc.*, 882 F.2d at 616 (after the bankruptcy stay was terminated, suit brought by secured lender against the creditor asserting a right of setoff).

While not clearly articulated, however, one can construe NPF X, Inc.'s argument regarding its lien priority to suggest that if its lien interest primes the setoff right of the United States in these receivables, the "secured interest" of the United States is "adequately protected," as the government has no legitimate right to retain the proceeds of its intended offset. From this perspective, the priority issue is implicated in this motion.

In addition, as alluded to earlier, if the United States is permitted to setoff, federal law appears to preclude anyone but the Medicare providers from obtaining payment from HCFA of the amounts due to the debtors. NPF X, Inc. would seem to have no independent right to demand payment of its collateral from HCFA. *See generally Matter of Missionary Baptist Foundation of America, Inc.*, 796 F.2d 752 (5th Cir.1986) (discussing a similar provision in the medical assistance program).

Therefore, and as the parties have fully argued this issue, I will consider the priority question.

C.

◼ NPF X, Inc. maintains that the primacy of its security interest over the common law setoff rights of the United States is recognized by the Pennsylvania Uniform Commercial Code, 13 Pa.C.S.A. § 9312(e)(1).[15] This priority argument of NPF X, Inc. contains two assumptions: that state UCC law applies to this issue, or

would otherwise be incorporated by federal common law; and that the requirement enunciated in decisions such as *United States v. City of New Britain, Conn.*, 347 U.S. 81, 84, 74 S.Ct. 367, 98 L.Ed. 520 (1954), which requires that the state created lien be "choate" (*i.e.*, the identity of the lienor, the property subject to the lien, and the amount of the lien are established) before the federal lien arises in order to obtain priority, either does not apply in the setoff context or is met regarding receivables which did not exist until shortly before the debtors' bankruptcy filing.

There are reported decisions which do not support both of these assumptions. They find more persuasive application of the principle that one who claims a property interest has no right to payment greater than the entity who granted the interest. For example, the district court in *In re Alliance Health of Fort Worth, Inc.* concluded that the United States' common law right of setoff always trumps a security interest as the secured creditor is not entitled to payment greater than the debtor/medical provider. *See also Rochelle v. United States*, 521 F.2d 844, 855 (5th Cir. 1975) ("We think a subordinated claim can be used to set off a claim by the bankrupt estate against the creditor even though the subordinated claim could not itself share in the dividends"), *modified on other gnds*, 526 F.2d 405 (5th Cir.), *cert. denied*, 426 U.S. 948, 96 S.Ct. 3168, 49 L.Ed.2d 1185 (1976); *In re Sound Emporium, Inc.*, 70 B.R. 22, 24 (W.D.Tex.1987) (IRS had the right to setoff taxes debtor owed by amount owed to debtor by United States Army even though the government's claim was subordinate to a prior secured claim); *In re Defense Services, Inc.*, 104 B.R. 481, 485 (Bankr.S.D.Fla.1989) ("It is, however, irrelevant to the right of setoff whether

---

**15.** *See* footnote 14, *supra.*

the claim asserted as a setoff is a subordinated claim").

This approach discounts the applicability of U.C.C. section 9–312 by limiting the right of a secured creditor to recover from an obligor of its debtor no more than the debtor itself could recover. Although not mentioned by the court in *In re Alliance Health of Fort Worth, Inc.*, given the anti-assignment provision of Medicare Part B receivables—requiring that payments may only be made to medical providers and not third parties, *see* 42 U.S.C. § 1395u(b)(6)—such a holding may be persuasive in these circumstances. That is, since NPF X, Inc. cannot demand payment from HCFA or its carrier directly, but can only obtain payment from the debtors, it is not intuitively correct that this creditor has a greater right to payment than the debtors, whose rights would be subject to common law setoff.[16]

I hesitate, however, to so conclude. In the context of a dispute to consider the legitimacy of the government's right to setoff Medicare Part A receivables, the District Court for the Eastern District of Pennsylvania in *In re Metropolitan Hospital*, 131 B.R. at 290–91, held that the Pennsylvania U.C.C. was indeed relevant to the dispute between the United States, which asserted a setoff right, and secured bondholders. The U.C.C. provision discussed by the District Court was not section 9–312, however, but 9–318. This provision states:

(a) Rights of account debtor against assignee.—Unless an account debtor has made an enforceable agreement not to assert defenses or claims arising out of a

sale as provided in section 9206 (relating to agreement not to assert defenses against assignee) the rights of an assignee are subject to:

(1) all the terms of the contract between the account debtor and assignor and any defense or claim arising therefrom; and

(2) any other defense or claim of the account debtor against the assignor which accrues before the account debtor receives notification of the assignment.

(b) Effect of contract modification on assignee.—So far as the right to payment or a part thereof under an assigned contract has not been fully earned by performance, and notwithstanding notification of the assignment, any modification of or substitution for the contract made in good faith and in accordance with reasonable commercial standards is effective against an assignee unless the account debtor has otherwise agreed but the assignee acquires corresponding rights under the modified or substituted contract. The assignment may provide that such modification or substitution is a breach by the assignor.

(c) Notification to account debtor of assignment.—The account debtor is authorized to pay the assignor until the account debtor receives notification that the amount due or to become due has been assigned and that payment is to be made to the assignee. A notification which does not reasonably identify the rights assigned is ineffective. If requested by the account debtor, the assignee must seasonably furnish reason-

---

**16.** Indeed, NPF X, Inc. does not address 13 Pa.C.S.A. § 9318(d), which prohibits the enforceability of anti-assignment provisions. *See generally Hanover Bank of Pennsylvania v. United Penn Bank*, 326 Pa.Super. 593, 601, 474 A.2d 1137 (1984). If the federal Medi- care statute may validly contain an anti-assignment provision regarding receivables, which conflicts with state law, the federal government's setoff rights regarding these receivables may also be in conflict with state law, such as 13 Pa.C.S.A. § 9312.

able proof that the assignment has been made and unless he does so the account debtor may pay the assignor.

(d) Contract term prohibiting assignment ineffective.—A term in any contract between an account debtor and an assignor is ineffective if it prohibits assignment of an account or prohibits creation of a security interest in a general intangible for money due or to become due or requires the consent of the account debtor to such assignment or security interest.

13 Pa.C.S.A. § 9318.

Based upon section 9–318, the *Metropolitan Hospital* court held: "Under § 9–318(a)(2) a right of setoff may be asserted if it arises before notification of the account assignment." *Id.*, 131 B.R. at 290. The vast majority of courts which utilize the U.C.C. to determine the priority of a setoff claim against a secured claim agree with the *Metropolitan Hospital* decision and rely upon the provisions of section 9–318 rather than section 9–312. *See, e.g.,* *Bank of Kansas v. Hutchinson Health Services, Inc.,* 246 Kan. 83, 785 P.2d 1349 (1990) (U.C.C. section 9–318 governs the priority to payment of state health care receivables between a secured lender and a state agency); *In re Davidson Lumber Sales, Inc.,* 66 F.3d 1560, 1565 n. 6 (10th Cir.1995); *In re Apex Oil Co.,* 975 F.2d 1365, 1367–68 (8th Cir.1992); *West One Bank, Utah v. Life Ins. Co. of Virginia,* 887 P.2d 880, 883 (Utah App.1994); *Pioneer Commercial Funding Corp. v. United Airlines, Inc.,* 122 B.R. 871 (S.D.N.Y. 1991); *In re Otha C. Jean & Associates, Inc.,* 152 B.R. 219, 223 (Bankr.E.D.Tenn. 1993) ("Section 9–318 determines priority between USBI's right of set-off and the

banks' security interest"); *see generally* Sherman, "Article 9 and Other Non–Bankruptcy Remedies," 465 *PLI/Comm.* 295, 408–09 (1988) ("For non-bank setoffs, most courts have followed Section 9–318(1)(b) of the U.C.C. which provides that the rights of an assignee are subject to any claim of the account debtor (i.e. setoff right) against the assignor which accrues before the account debtor receives notice of the assignment"); *see also Seattle–First National Bank v. Oregon Pacific Industries, Inc.,* 262 Or. 578, 581–82, 500 P.2d 1033 (1972) ("defendant can assert the setoff only if it accrued before the defendant was notified of Centralia's assignment to the bank").[17]

The court in *Metropolitan Hospital* concluded, in applying section 9–318, that the statutory right to offset Medicare overpayments and underpayments, found in 42 U.S.C. § 1395g, placed all secured creditors on notice, prior to any grant or perfection of their security interests, of the government's setoff rights in those circumstances. Thus, by virtue of section 9318(a)(2), the right of setoff arose before the security interest and thereby held priority. *Id.,* 131 B.R. at 290.

The United States does not contend in this dispute that it possesses any statutory right of setoff which placed secured creditors such as NPF X, Inc. on notice of its rights before its security agreements were signed. Nonetheless, in *In re Alliance Health of Fort Worth Inc.,* 240 B.R. at 704, a case involving Medicare Part B receivables, the court focused upon another aspect of section 9–318 which undermines the legal position taken here by NPF X, Inc.

---

**17.** I note that the 1972 Uniform Commercial Code Comment, included at the end of 13 Pa.C.S.A. § 9318, states, in part: "Subsection 1 makes no substantial change in prior law.

An assignee has traditionally been subject to defenses or set-offs existing before the account debtor is notified of the assignment."

Under U.C.C. section 9–318(a), it is not sufficient for the lien creditor to prevail over setoff rights simply by possessing a prior perfected security interest. The statute also requires that "notification" of this interest—the "assignment" of right on the account—be received by the "account debtor"—the entity asserting a setoff right—before the right to setoff arises. 13 Pa.C.S.A. § 9318(a)(2). An application of the *Alliance Health* court's analysis would hold that the filing of a financing statement by a secured creditor would not by itself constitute "notice" to the United States of NPF X, Inc.'s interest in these receivables as required by section 9–318(a)(2). *See In re Alliance Health of Fort Worth, Inc.*, 240 B.R. at 704 (*citing In re Davidson Lumber Sales, Inc.*, 66 F.3d 1560, 1565–66 (10th Cir.1995)); *see also Royal Bank and Trust Co. v. Midwest Boutiques, Inc.*, 1988 WL 140876, *2 (S.D.N.Y.1988) (actual notice under section 9–318(a)(2) is required to defeat right of setoff); *Chase Manhattan Bank (N.A.) v. State*, 40 N.Y.2d 590, 594, 388 N.Y.S.2d 896, 357 N.E.2d 366 (1976); *see generally Frankford Trust Co. v. Stainless Steel Services, Inc.*, 327 Pa.Super. 159, 165–66, 475 A.2d 147 (1984) ("Generally, an assignee remains at the peril of the subsequent dealings between the original parties until *adequate* notice of the assignment is given to the obligor") (emphasis added).

Section 9–318(a)(2) is construed as requiring "actual notice" of the interests of a third party in an account receivable, *see Chase Manhattan Bank v. State*, 40 N.Y.2d at 594, 388 N.Y.S.2d 896, 357 N.E.2d 366, and that such "actual notice" is not provided by the filing with a state official of a financing statement. "An account debtor, unlike a potential creditor, is not obligated to check the UCC recordings continually to ascertain whether the debt has been assigned, and the filed financing statement offers no actual notice of the

assignment's existence that would affect an account debtor's right to assert subsequent claims and defenses." *In re Davidson Lumber Sales, Inc.*, 66 F.3d at 1566; *cf. Badillo v. Tower Ins. Co. of New York*, 92 N.Y.2d 790, 686 N.Y.S.2d 363, 709 N.E.2d 104 (1999) (insurance carrier is not obligated to pay creditor with a security interest in insurance proceeds who has simply filed a financing statement, as such filing is not adequate notice of the right to payment).

In this dispute, NPF X, Inc. offered no evidence that the United States (through one of its agencies) received actual notice of its asserted security interest in these accounts receivables before the common law right of setoff accrued. Thus, even if I accept its position that the priority of its interest in the debtors' receivables vis-a-vis the government should be governed by state U.C.C. law, the setoff rights of the United States would prevail in this instance. *See also Bank of Kansas v. Hutchinson Health Services, Inc.*, 246 Kan. at 91–92, 785 P.2d 1349 (setoff of state heath care receivables had priority over prior perfected security interest when there is no evidence that the state government had notice of the security interest before its right to setoff accrued). *Compare In re Apex Oil Co.*, 975 F.2d at 1367, 1369 (when "account debtor" received copy of invoices stamped with an information notice, to the effect that the proceeds of the invoice were secured and that payment should be directed to the account creditor, in care of the secured creditor, and such invoices were received prior to any right of setoff, the actual notice provisions of section 9–318(a) were complied with).

Accordingly, the existence of NPF X, Inc.'s security interest in the debtors' Medicare Part B receivables does not justify denial of the government's request to terminate the automatic stay. The government's setoff rights in these debtors'

Medicare receivables have priority over NPF X, Inc.'s security interest under section 9–318 of the Pennsylvania Uniform Commercial Code. *See generally In re Metropolitan Hospital,* 131 B.R. at 291.

An appropriate order shall be entered.[18]

## ORDER

AND NOW, this 18th day of October, 2000, for the reasons stated in the accompanying memorandum, it is hereby ordered that the motion of the United States to terminate the automatic stay so that it may exercise its common law right of setoff against Medicare Part B prepetition receivables owing to both debtors is granted.

---

**18.** Although I have considered the competing interests of these creditors in determining this motion, I again note that the only relief sought is the termination of the bankruptcy stay. To the extent that NPF X, Inc. holds a lien on the debtors' prepetition Medicare receivables, the validity of that lien has not been challenged in this contested matter.